CRAWLEY, Judge.
Tony DeLeon and his wife, Willie Joyce DeLeon, sued Kmart Corporation, alleging assault and battery, false imprisonment, and intentional infliction of emotional distress (the tort of outrage). The trial court entered a judgment as a matter of law for Kmart on the outrage claim and submitted the remaining claims to the jury. The *1216 jury returned a verdict for Kmart, and the DeLeons appealed to the Alabama Supreme Court. The supreme court transferred the appeal to this court, pursuant to 12-2-7(6), Ala.Code 1975.
I.
The DeLeons contend that the trial court erred by granting Kmart’s motion for a judgment as a matter of law on their claim alleging the tort of outrage. Our supreme court first recognized the tort of outrage in American Road Service Co. v. Inmon, 394 So.2d 361 (Ala.1980). In In-mon, the court set forth the following elements for the tort of outrage: (1) that the defendant’s conduct was intentional or reckless; (2) that it was extreme or outrageous; and (3) that it caused emotional distress so severe that no reasonable person could be expected to endure it. The court explained that, by the second element, it was referring to “conduct so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society.” 394 So.2d at 365 (citing Restatement (Second) of Torts § 46 emt. d, at 72 (1948)).
Viewed in the light most favorable to the DeLeons, the evidence tended to show the following: The DeLeons went to the Kmart store in Fairfield to purchase one item. While they were there, they decided to make a list of the names and prices of other items they wanted to buy when Mr. DeLeon received his disability check on the first day of the following month. As they were making their shopping list, the DeLeons entered the garden department and separated from each other to look for a particular insecticide. Edward Tucker, a Kmart employee who testified that he thought the DeLeons were “price checkers” for a competing store, approached Mrs. DeLeon and asked her who she was “working for.” Mrs. DeLeon answered that she was not working for anyone, but that she was writing down the names and prices' of products for her own use. Tucker continued to ask who Mrs. DeLeon was working for, and Mrs. DeLeon continued to deny that she was working for anyone. Then, according to Mrs. DeLeon, Tucker snatched the list she had been making and spun her around. When Mrs. DeLeon tried to retrieve the list, Tucker put his hand in front of her and pinned her against a merchandise shelf. .Mrs. De-Leon screamed and Mr. DeLeon came to her defense. Mr. DeLeon grabbed the list away from Tucker, and the two men began shouting at each other. According to the DeLeons, Tucker picked up a telephone and threatened to call the police unless they told him who their employer was. Mrs. DeLeon asked to speak to the store manager, and Tucker escorted them to the manager’s office.'
The manager told the DeLeons to go to a room where shoplifters were taken for questioning. There, the manager questioned the DeLeons about who they were working for, and they continued to deny working for a competitor of Kmart. The DeLeons said that the manager also told them that he would call the police unless they told him who their employer was. Eventually, however, the manager announced that he was not going to call the police, and Mrs. DeLeon then said that she wanted to call the police. When the police arrived, Mrs. DeLeon described to them the events that had occurred that morning in the Kmart store and stated that she wanted to lodge a complaint against Tucker and the manager, based on what she considered was unlawful activity by the Kmart employees.
The trial court correctly submitted the claims of assault and battery, as well as false imprisonment to the jury. It also correctly granted Kmart’s motion for a judgment as a matter of law on the outrage claim. The conduct of the Kmart employees, though possibly insulting and embarrassing to the DeLeons, simply does not amount to “conduct so outrageous in character and so extreme in degree as to *1217 go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society.” Inmon, 394 So.2d at 365 (citing Restatement (Second) of Torts § 46 emt. d, at 72 (1948)).
In Thomas v. BSE Industrial Contractors, Inc., 624 So.2d 1041 (Ala.1993), our supreme court explained that the tort of outrage is an extremely limited cause of action:
“This Court has consistently held that the tort of outrage is a very limited cause of action that is available only in the most egregious circumstances. As a consequence, this Court has held in a large majority of the outrage eases reviewed that no jury question was presented. In fact, in the 12 years since Inmon was decided, all cases in which this Court has found a jury question on an outrage claim have fallen within only three categories: (1) cases having to do with wrongful conduct in the context of family burials; (2) a case where insurance agents employed heavy-handed, barbaric means in attempting to coerce the insured into settling an insurance claim; and (3) a case involving egregious sexual harassment.”
624 So.2d at 1044 (citations omitted).
II.
The DeLeons argue that the trial court erred by allowing evidence that they had made 36 prior complaints to the Birmingham Police Department. During cross-examination of Mrs. DeLeon, the following occurred:
“Q. [By counsel for Kmart]: But the truth, Mrs. DeLeon, is that you know that there are 36 police reports filed with the City of Birmingham that involve either you or your husband?
“MR. PENICK [counsel for the De-Leons]: Objection, Your Honor, this is improper, irrelevant, and immaterial.
“THE COURT: Overruled.
“Q. Thirty-six times you’ve been involved in writing some kind of report or your husband has written some kind of report about an incident that has happened?
“A. I don’t ask for things to happen to me, but if I’ve been violated a hundred times I will call the police. I can’t take the law into my hands, so I have nobody to turn to but to call the police when things happen to me.”
Counsel for Kmart then sought to introduce certified copies of 36 incident reports made by the DeLeons to the Birmingham Police Department. The DeLeons’ counsel objected to the admission of the reports, and the trial court sustained that objection. Later, on cross-examination of Mr. DeLeon, the following occurred:
“Q. [By counsel for Kmart] And, Tony, you’re aware that there’s been a number of occasions in the past where your wife has called the police and made various incident reports. You’re aware of that aren’t you?
“MR. PENICK: Objection, Your Honor. This is irrelevant and immaterial.
“THE COURT: Overruled.
“Q. You’re aware of that, aren’t you? “MR. PENICK: Object to the form of the question.
“THE COURT: Overruled.
“Q. You’re aware that on numerous occasions she has filed different reports with the police over various [incidents], aren’t you?
“MR. PENICK: Objection. Immaterial as to what incidents she’s called the police on.
“THE COURT: As to time? Since?
“MR. IRELAND [counsel for Kmart]: Both prior to and since, on numerous occasions.
“Q. You’re aware of that, aren’t you?
*1218 “MR. PE NICK: Your Honor, I’m going to object again on the grounds that it’s immaterial as to whether or not she may have called the police on some situation that’s totally unconnected to the episode.
“THE COURT: Overruled.”
Kmart claims that the evidence was admissible to show habit. It argues that “[tjhe DeLeons habitually seek the participation of the police in their daily lives and a demonstration of their previous proclivity to phone the police for trivial reasons is admissible to prove conduct in accordance with this habit on a particular occasion.”
“A habit ... is the person’s regular practice of meeting a particular kind of situation with a specific type of conduct, such as the habit of going down a particular stairway two stairs at a time, or of giving the hand signal for a left turn, or of alighting from railway cars while they are moving. The doing of the habitual acts may become semi-automatic.”
Rule 406, Ala. R. Evid. (Advisory Committee Notes) (quoting E. Cleary, McCormick on Evidence § 195 (2d ed.1972)) (emphasis added by the Advisory Committee).
“[Hjabit refers to the type of nonvoli-tional activity that occurs with invariable regularity. It is the nonvolitional character of habit evidence that makes it probative.... Habits have a reflexive, almost instinctive quality.”
Weil v. Seltzer, 873 F.2d 1453, 1460 (D.C.Cir.1989).
We doubt that the challenged testimony constitutes evidence of habit. The DeLeons’ telephoning the police is necessarily volitional and purposeful, rather than semi-automatic and instinctive. If conduct “entails some amount of judgment and decision making, [it] is too complex and is susceptible to too much variation to qualify as habit evidence.” Brett v. Berkowitz, 706 A.2d 509, 516 (Del.1998).
Nevertheless, even if the testimony did qualify as “habit” evidence under Rule 406, it was immaterial. Evidence is admissible if it has “any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.” Rule 401, Ala. R. Evid. The DeLeons’ alleged tendency to summon the police to redress injustice— i*eal or perceived—was not a fact of any consequence to the determination of the action.
Admission of this evidence cannot be deemed harmless error, for the very reason Kmart argues that the evidence was admissible: the evidence tended to demonstrate on the part of the DeLeons’ a “proclivity to phone the police for trivial reasons” and, thus, to belittle their claims in the eyes of the jury.
The judgment of the circuit court is reversed, and the cause is remanded for a new trial.
REVERSED AND REMANDED.
ROBERTSON, P.J., and YATES, MONROE, and THOMPSON, JJ., concur.